IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DAVID HAKIM, | ) |
|         Plaintiff, | ) |
| | ) Case No. 1:15-cv-06487 |
| v. | ) |
| | ) |
| SAFARILAND, LLC and DEFENSE TECHNOLOGY CORPORATION OF AMERICA, | ) Honorable Thomas M. Durkin |
| | ) |
|         Defendants. | ) |

**DEFENDANTS' POST-TRIAL MOTION**

NOW COME defendants, SAFARILAND, LLC and DEFENSE TECHNOLOGY CORPORATION OF AMERICA, by their attorneys PAUL V. ESPOSITO and CLAUSEN MILLER PC, and move this Honorable Court pursuant to Fed. R. Civ. P. 50(b) and 59(a) to grant defendants: (a) judgment as a matter of law on all claims, or in the alternative, (b) a new trial on all issues of liability and damages as to the failure-to-warn claim, or (c) a remittitur of the verdict from $7.5 million to $1.0 million, and if plaintiff refuses to accept it, a new trial on the failure-to-warn claim. In support, defendants state:

**I.    Motion for judgment as a matter of law [Rule 50(b)]**

Defendants incorporate here the arguments raised in their briefing on their jmol motion at the end of plaintiff's case (Dkt 205 and 239).

Defendants' case also supports jmol. Because defendants sold breaching rounds to the sheriff's office (DCSO), not the SWAT officers, DCSO needed to warn officers of potential dangers. *Zahumensky v. Chicago White Sox, Ltd.*, 2019 IL App (1st) 177878, ¶56, 125 N.E.2d 1157, ¶56. Defendants had "neither the means of controlling [DCSO's] subsequent actions nor the opportunity to provide warnings directly to [plaintiff and the SWAT team]." *Id.*

1

In determining the adequacy of defendants' warnings, this Court should consider DCSO's institutional knowledge about the breaching rounds. Warnings are unnecessary when a party has the necessary knowledge. *Proctor v. Davis*, 291 Ill. App. 3d 265, 277, 682 N.E.2d 1203, 1211 (1st Dist. 1997). Defendants' evidence established DCSO's extensive knowledge of the rounds—knowledge it passed to SWAT officers including plaintiff.

By 2008 at the latest, DCSO knew about the potential dangers of the TKO breaching round. In September 2008, DCSO provided an eight-hour training course on shotgun breaching (Dkt 224: Def. Ex. 31D, p.2-3). Attendees included plaintiff and fellow SWAT members Harris, Groh, O'Neil, Crane, and Bata, all of whom testified at trial (*Id.* at p.5). SWAT member Van de Voorde also attended (*Id.*). O'Neil and Bata co-instructed (*Id.* at p.1). The 2008 shotgun breaching training included: (1) classroom instruction on shotguns and breaching rounds, (2) a study of angles in breaching wood doors, (3) dry fire, and (4) live fire (*Id.* at p.2).

The lesson plan contained warnings about the proper use of defendants' TKO round (Dkt 224: Def. Ex. 31D at Ex. Q, p.7). It stated that students would learn to identify "the single most critical issue" involved in preventing injuries (*Id.* at Ex. Q, p.4, ¶3). It warned that the round is "[c]apable of causing death or serious injury, when used in a manner that does not preclude the possibility of primary or secondary missiles entering the target location" (*Id*. at Ex. Q, p.6).

The lesson plan discussed deployment. It identified proper targets as "deadbolts, 'throws,' locking mechanisms, hinges, etc."—all metal (*Id*. at Ex. Q, p.7). To accomplish its task, the round must deliver "a significant amount of energy" (*Id.*). The plan specifically warned SWAT members about the type of doors a round can penetrate:

> [T]he inherent energy and make-up of a projectile capable of overcoming such solid/metallic targets, will penetrate <u>any</u> wooden door (hollow or solid, residential or industrial), and certain varieties of metal doors (*Id.* at Ex. Q, p.7-8) (emphasis in original).

It had to be that way. If a round disintegrated upon contact with wood, the round could never disrupt a metal object preventing entry. That means it would fail to meet ordinary consumer expectations that it could safely breach a door.

The lesson plan emphasized safety in deploying the round:

> This penetration [of doors] can have LETHAL CONSEQUENCES, if a round is not delivered at an angle that prevents primary and secondary missiles from entering the room. Controlling the angle of presentation is the single most important aspect of safe and effective deployment (Ex. 31D at Ex. Q, p.8; emphasis in original).

It instructed breachers to dig the teeth of a muzzle into the wood at the deployment location (*Id.*). In determining the proper shooting angle, the lesson plan states: "A standard rule of thumb is a '45-45 degree' angle. Both angles are CRITICAL to the safe and effective use of this product" (at Ex. Q, p.9; emphasis in original). The angle is so critical that even if a team must modify a breaching operation at an active scene, "*[i]n no case shall it involve any deviation from the '45-45' angular engagement of the barrier itself*" (*Id.*; emphasis supplied).

The lesson plan required trainees to demonstrate shooting proficiency and pass a written test (*Id.* at Ex. Q, p.9-14). A test question asks about the probability of a round's passing through an ordinary wooden door (*Id.* at Ex. Q, p.11). Defense expert Ken Hubbs told the jury the correct answer: "certain" (Dkt 236 at 1567). No one disputed it.

The lesson plan established two important facts. First, well before the accident, DCSO had institutional knowledge about the capabilities of the round. If DCSO failed to transmit it to SWAT members, whether at the 2008 training session or later, it was not defendants' fault. Any failure to warn plaintiff and Alaniz would add to the proof that DCSO and its SWAT team were the 100% cause of the accident.

3

The second fact is equally important: plaintiff attended the 2008 training session. Most likely, he heard about the round's ability to penetrate wooden doors and injure persons in the line of fire. Presumably, he remembered what he heard. Whether he was inattentive or forgetful is irrelevant; he had the opportunity to learn the critical information. The consumer-expectation test focuses on the understanding of the person harmed by an allegedly defective product. *Mikolajczyk v. Ford Motor Co.*, 231 Ill. 2d 516, 530-31, 901 N.E.2d 329, 338 (2008). As a trained SWAT officer, plaintiff would have known that he needed to be out of the line of fire of a missed shot.

In short, no reasonable jury may conclude the defendants breached a duty to warn.

Defendants' case-in-chief also provided more evidence as to 100% proximate cause. Defendants introduced the deposition testimony of Patrick O'Neil, the breaching instructor on the day of the accident (Dkt 234 at 1186-1260). As did plaintiff's witness Abruzzo, O'Neil testified to the progressive training "[t]o make sure everybody is doing it right" (*Id.* at 1190-92).

SWAT member Mark Asmussen asked O'Neil to "put on some breaching at the end of training" (Dkt 234 at 1202). O'Neil told him he would only conduct a demonstration (*Id.* at 1203). The training notice to the SWAT team did not mention the nature of the training (*Id.* at 1204-05). O'Neil designed the shotgun segment to provide an "overview" of shotgun breaching, not to provide certifications or authorizations to shoot the weapon (*Id.* at 1206; Dkt 224: Def. Ex. EE at p.8). His plan did not include live breaching or breaching procedures (*Id.* at 1207, 1209; Dkt 224: Def. Ex. EE at p.8). Normal training takes a day, with shooting done on a flat range for safety (*Id*. at 1214). Shooting inside a home would be appropriate only after everyone was trained (*Id.* at 1214-15). O'Neil was unaware whether anyone appointed a safety officer or

4

conducted a safety inspection (*Id.* at 1215-18). During his case-in-chief, plaintiff offered no evidence that either happened.

The planned shotgun session lasted 30-60 minutes (Dkt 234 at 1219-20). After the demonstration, SWAT leader Harris told O'Neil that there would be live breaching with the available rounds (*Id.* at 1223). When O'Neil responded that the team needed more training, Harris replied that houses are not often available (*Id.* at 1224). O'Neil had no response; he did what his leader told him (*Id.*). O'Neil testified to a lack of coordination and communication as to live breaching. Team members randomly selected doors (*Id.* at 1226). O'Neil did not know the location of upstairs breaching (*Id.*). One station lacked a certified instructor (*Id.* at 1227). It all happened soon after demonstration, and by the time O'Neil went downstairs, shotguns and rounds were already there (*Id.* at 1228-29, 1233-34). O'Neil was concerned about simultaneous breaching at three stations without his knowing what was happening at them (*Id.* at 1231: "[I]t wasn't part of my plan for the day"). O'Neil told Van de Voorde to clear everyone upstairs from the stairwell, but O'Neil did not know where they went (*Id.* at 1230-32). O'Neil later conceded that if Van de Voorde had cleared the area, the accident would not have occurred (*Id.* at 1260).

O'Neil worked with Alaniz, who "was having difficulty on the hinges" (Dkt 234 at 1237). For someone new to breaching, "hinges are difficult to get" because of the angle (*Id.*). Even people proficient with other firearms can miss a hinge from three inches away if they lack proper technique as to angles (*Id.* at 1257-58). O'Neil noticed that Alaniz was not doing it right, so he worked on moving Alaniz's angle (*Id.* at 1238). O'Neil wanted him to shoot "between the hinge and the door" to disrupt the screws—the weakest link (*Id.* at 1239). According to O'Neil, using a 45-degree angle is not good for hinges:

5

> You're trying to peel that. It depends, I mean, your hinges can be different. Right? So, I mean, you're trying to get in between that and peel that in with the screws.
>
> \* \* \*
>
> *So there's nothing else to do except try to shear that [door] off [the hinge].*
>
> \* \* \*
>
> [Alaniz was] trying to hit the hinge, yeah, because he wasn't on the right angle that he was trying to get, *so we were trying to get the right angle for him to shear that off* (*Id.* at 1240, 1255; emphasis supplied).

Alaniz followed O'Neil's directions (*Id.* at 1240-41). The hinge remained attached to the door and doorframe (*Id.* at 1242). There were no marks on the hinge; the screws were unaffected (*Id.* at 1242-43). "*It looks like he missed the hinge right here where this is going on -- going in*" (*Id.* at 1254; emphasis supplied). Under O'Neil's direction, Alaniz did what defendants expressly advised in writing against doing [Dkt 224: Pl. Ex. 3 at p.2: "The technique is NOT to shear the door away from the attachment, it is to directly impact the lock or hinge and disrupt it" (emphasis in original)]. Defendants could not have reasonably foreseen that a certified instructor would disregard and countermand this explicit warning.

The accident was the 100% result of poor planning, coordination, communication, training, and direction by DCSO and its SWAT team. Defendants are entitled to jmol.

## II.  Motion for a new trial [Rule 59(a)]

### A.  The verdicts are legally inconsistent.

Plaintiff presented his case using the consumer-expectation method of proof. On his defective manufacture and defective design claims, the jury returned verdicts for defendants. But on his failure to warn claim, the jury found for plaintiff. If the Court denies jmol, it should order a new trial because the verdicts are legally inconsistent.

6

Whether verdicts are legally inconsistent is a question of law. *Redmond v. Socha*, 216 Ill. 2d 622, 642, 837 N.E. 2d 883, 895 (2005). A court should exercise all reasonable presumptions in favor of the verdicts. *Id.* at 643. To support a new trial, verdicts must be absolutely irreconcilable, with no reasonable hypothesis supporting them. *Id.* at 643-44.

By finding for defendants, the jury necessarily found that: (1) an ordinary consumer expected that a TKO round would safely penetrate a wood door to disable a metal object holding it closed, and (2) defendants safely manufactured the round striking plaintiff. SWAT officers did not need a warning, in so many words, that a round must hit metal to disintegrate. That warning was implicit in the consumer expectation defendants satisfied. Essentially, the Court made this observation during the *Daubert* hearing on plaintiff's eventually-withdrawn expert Philip O'Keefe (Dkt 162). Commenting on the warning in defendants' product literature, the Court stated:

> [O]n its face, I've got to tell you, it says what it says. And I don't know how that is a failure to warn. It seems pretty clear-cut.
>
> \*   \*   \*
>
> But if [a breaching round] leaves the hands of Safariland with a warning that is as explicit as the one I saw, I think there's some difficulty on the failure-to-warn case. Yeah, when they basically tell you, you've got to shoot through metal and it'll disintegrate, and don't shoot in a wall. But we'll see how that goes (Dkt 162 at 55-56).

The verdicts cannot be reconciled on proximate-cause grounds. On the failure-to-warn claim, the jury necessarily found that (1) defendants failed to warn of an unreasonable danger, and (2) that failure was a proximate cause of plaintiff's injuries. On the defective design and manufacture claims, the jury could have found that (1) the round met or did not meet consumer expectations, and/but (2) the defects were not a proximate cause of plaintiff's injury. But because

7

plaintiff's proximate-cause evidence was identical under all three theories, an irreconcilable inconsistency necessarily arose out of the findings as to a product defect.

The Court should grant a new trial.

### B. The verdict on plaintiff's failure-to-warn claim is against the manifest weight of the evidence.

"A motion for new trial can be granted when the district court—in its own assessment of the evidence—believes that the verdict went against the manifest weight." *Mejia v. Cook County*, 650 F.3d 631, 634 (7th Cir. 2011). The court "'has the power to get a general sense of the weight of the evidence, assessing the credibility of witnesses and the comparative strength of the facts put forth at trial.'" *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012). In making a manifest-weight determination, evidence must be weighed neutrally, rather than in a light favorable to the non-movant. *Id.* A verdict will be set aside "only if no rational jury could have rendered the verdict." *Id.*, quoting *Marcus & Millichap Inv. Servs. of Chi., Inc. v. Sekulovski*, 639 F.3d 301, 313-14 (7th Cir. 2011).

Here, no rational jury could have reached a verdict for plaintiff on the failure-to-warn claim—the only claim on which he succeeded. Defendants incorporate their Rule 50(a) motion and reply and their Rule 50(b) motion (Dkt 205, 239). Plaintiff had no liability expert supporting his claim. Even before trial, based on the clarity of product literature this Court questioned plaintiff's failure-to warn claim (Dkt 162 at 55-56). Plaintiff's witness Eric Koty testified that O'Neil or Murakami stated at the Hinsdale training session that a round needed to hit metal (Dkt 230 at 797, 816-17, 824). Plaintiff himself testified that based on the product literature, a user needed to hit metal for a round to disintegrate (Dkt 231 at 972, 978-79).

Moreover, plaintiff failed to prove that defendants' conduct was a proximate cause of his injuries. The testimony of plaintiff's witness Steven Abruzzo as to progressive training showed

8

that Alaniz's training fell far short (Dkt 228 at 577-79). O'Neil's testimony confirmed Alaniz's lack of sufficient training (Dkt 234 at 1191-92, 1224). Alaniz's lack of training resulted in his missing the hinge and penetrating the riser—a fact established by the State's Attorney investigation (Dkt 228 at 595). Though claiming to have hit the hinge, Alaniz ran upstairs immediately after hearing "real world" (Dkt 226 at 296-97). He offered no evidence that he studied the hinge. His mistaken belief is not surprising given his understandable difficulty in accepting that he accidentally shot a buddy. As for Groh's testimony that Alaniz hit the hinge, he was outside at the time (Dkt 227 at 492). Groh's belief is inconsistent with the investigative report, the photos of the actual hinge, the distorted shape of the exemplar hinge, and the video of the training demonstration. That video shows a hinge flying off the door, which certainly did not happen at the time of the accident. There was no evidence that Alaniz disrupted the hinge. O'Neil admitted that he told Alaniz to "shear" the door off the hinge—the very technique defendants expressly disapproved (Dkt 224: Pl. Ex. 3, p.2). Both Alaniz and O'Neil testified that Alaniz complied with O'Neil's direction (Dkt 226 at 319-20; Dkt 234 at 1240-41).

The accident happened because of misjudgments by DCSO and the SWAT team. DCSO knew for years the capabilities of the breaching round and the potential dangers from improper deployment. It allowed inadequately trained officers to shoot in a house never inspected for safety. The exercise was uncoordinated and lacking in communication. O'Neil instructed Alaniz on a prohibited technique and never checked whether plaintiff was in the line of a missed shot— one predictable from an untrained shooter. The exercise was an accident waiting to happen. Plaintiff may not make the breaching round a scapegoat.

Neutrally assessing the weight of the evidence, the credibility of witnesses, and the comparative strength of the facts offered at trial, the verdict for plaintiff is against the manifest weight of the evidence. This Court should order a new trial on the failure-to-warn claim.

### C. This Court should order a new trial as to plaintiff's failure-to-warn claim or remit damages to $1.0 million.

"In diversity cases, we apply the federal standard to determine whether a jury verdict is excessive, though our determination is guided by state standards where precedent exists." *Dresser Indus., Inc. v. Gradall Co.*, 965 F.2d 1442, 1446 (7th Cir. 1992). A federal court will only modify awards if they are "'monstrously excessive, born of passion and prejudice, or not rationally connected to the evidence.'" *Id.* The Illinois standard is similar. *Richardson v. Chapman*, 175 Ill. 2d 98, 113, 676 N.E.2d 621, 628 (1997) ("falls outside the range of fair and reasonable compensation or results from passion or prejudice, or if it is so large that it shocks the judicial conscience"). For a nonfatal injury, a court may consider permanency, possible future deterioration, medical expenses, and restrictions from the injury, among others. *Id.* at 113-14.

Generally, the remedy for excessive damages is a remittitur, which if a plaintiff refuses will result in a new trial. *Adams v. City of Chicago*, 798 F.3d 539, 541 (7th Cir. 2015). But a new trial is required without a conditional remittitur "when an award is a result of passion and prejudice, because the prejudice may have infected the verdict itself." *Dresser*, 965 F.2d at 1448. Here, defendants are entitled to a new trial on all issues, or at least a remittitur to $1.0 million and a new trial if not accepted.

The jury may have erroneously included attorney's fees in awarding damages. After itemizing past wages ($110,550) and stipulated medical expenses ($175,271), the jury award unusual amounts for past and future disability ($3,607,090) and past and future pain and suffering ($3,607,089) (Dkt 212). Calculating noneconomic damages is difficult enough, but

10

awarding the odd numbers itemized here suggests a different motive. Subtracting the usual ⅓ for attorney's fees from the gross award, the difference is an even $5,000,000. It suggests that the jury wanted plaintiff to net $5,000,000 and so itemized noneconomic damages to make it work. But a jury must base an award on actual damages, not on the added cost of recovering them.

Putting aside the possibility that the jury quietly awarded fees, the verdict is still excessive. Plaintiff needed a laminectomy to remove fragments of the round. Wound care became complicated but ultimately resolved. Plaintiff needed pain relief and physical therapy, but within 13 months returned to work without restrictions. He did not claim future lost wages and benefits. He currently works in a U.S. marshal program, and there is no evidence that his job will end or that he will lose it due to his injuries. As for medical expenses, plaintiff will likely not incur more arising out of the injury (Dkt 224: Candido dep. at 40-41).

But the total verdict is over 26 times plaintiff's economic damages. No current condition is life threatening. Plaintiff was not paralyzed. He injured his spine but walks without braces, crutches, or a cane. In court he displayed no evidence of pain or lack of mobility. Despite his injuries, he appears to be in excellent physical condition. No expert testified that his pain was permanent. He cannot run as fast as needed to pass the SWAT physical requirements, but he can run—and probably faster than most people. He stated that his balance and coordination issues mostly occur when running around curves on tracks. Without minimizing the injury, those are limited circumstances. He is unhappy about curtailing exercises and home chores but can still do them if needed. He runs a martial arts business. Although he feels his time with DCSO is limited, he offered no evidence of work-life expectancy in law enforcement, so his time may not have been as long as he hoped under normal circumstances. His doctor testified that he had become more subdued, but is not clinically depressed (Dkt 224: Jackson dep. at 36-37).

There was no rational connection between the evidence and award. Although not determinative, verdicts from other cases can provide a helpful reference for determining reasonableness. *Adams*, 798 F.3d at 545. Attached as Exhibit 1 are reports on Illinois jury verdicts involving back issues. None involves an accidental shooting. The injuries are not identical to those plaintiff suffered. Some involve more injuries than plaintiff suffered here. One verdict is as high as $2.85 million, with others in the $1-2 million range or lower. But even adjusting for age and inflation, those verdicts are far under the $7.5 million awarded here.

The disparity between the verdict here and those in other cases evidences that the jury acted out of passion and prejudice wrongly directed against defendants. Plaintiff's counsel fomented it. He treated defense expert Ken Hubbs as a villain rather than a witness. Without any factual basis, counsel asked Hubbs whether any court had ever barred him from testifying (Dkt 236 at 1467-69). In closing, counsel argued:

> [H]ubbs knows who he is working for. He knows what the game is. He's done this for 30 years. He's selling himself to people in litigation, and he gives opinions favorable to the person that's paying the bills (Dkt 237 at 1627).

These comments were inflammatory and unfairly prejudicial. *Regan v. Vizza*, 65 Ill. App. 3d 50, 52-54, 382 N.E.2d 409, 411-12 (1st Dist. 1978) ("sidekick," "righthand man," "Cisco Kidd and Poncho," "Matt Dillion and Chester"). With no good reason, plaintiff's counsel impugned Hubbs' integrity, and so impugned defendants' integrity. Counsel said that according to Hubbs, Alaniz was "lying" when Alaniz said he hit the hinge (Dkt 237 at 1627). Actually, Hubbs testified that Alaniz "believes" he hit the hinge (Dkt 236 at 1507). Counsel wrongly stated that Hubbs plays "fast and loose with the truth" and that "we don't know pretty much about anything that comes from Mr. Hubbs" (Dkt 237 at 1627, 1628). He exaggerated Hubb's testimony, accusing him of suggesting that glass at a bank "was a million miles thick" (*Id*. at 1631).

12

Counsel also wrongly incited a punitive award:

> I think Safariland *needs to know* that they can't come into a courtroom here, bring in some guy from California who has no education, other than an associate's degree and start talking about angles of deflection. He doesn't know anything about metal (Dkt 237 at 1641-42).

"Send a message" type arguments designed to incite moral outrage are inappropriate where only compensatory damages are involved. *Spyrka v. County of Cook*, 366 Ill. App. 3d 156, 170, 851 N.E.2d 800, 812 (1st Dist. 2006). It explains why the award was punitive, not compensatory.

Other comments from counsel added to the unfair prejudice. He was critical of defendants' not bringing in O'Neil, but O'Neil lives in Florida—and plaintiff bore the burden of proof (Dkt 237 at 1687). Though plaintiff did not call state police officer Chiappini, he offered his deposition statements for their truth, effectively treating him like an expert (*Id*. at 1687-88, 1690, 1692). He wrongly argued that diagrams of plaintiff's position on the first floor were "not evidence in this case," and repeated those arguments even after this Court sustained objections to them (*Id*. at 1690-91, 1697, 1698, 1700). He told the jury, "That's Mr. Patton testifying" when Mr. Patton was referring to exhibits already in evidence (*Id*. at 1691: "THE COURT: They're in evidence"). He stated that defendants did not call several witnesses, which improperly flipped the burden of proof (*Id*. at 1693-94, 1695). And without any supporting evidence, he argued that the stairway riser was a 2" x 4" board as an improper way of bolstering his case (*Id*. at 1696). These inappropriate comments resulted in a monstrously high verdict, demonstrated by the fact that the jury awarded almost 45% more noneconomic damages than plaintiff himself requested.

The verdict here shocks the judicial conscience. That standard asks whether an award is so far off the mark that in the interest of justice to the parties and the judicial system as a whole, it may not stand. Here, the award to plaintiff may not. Because unfair passion and prejudice

13

likely motivated it, this Court should award a new trial. Alternatively, it should enter a remittitur to $1.0 million, and if plaintiff refuses it, order a new trial on the failure-to-warn claim.

## CONCLUSION

SAFARILAND, LLC and DEFENSE TECHNOLOGY CORPORATION OF AMERICA, respectfully request an order granting defendants: (a) a judgment as a matter of law, or in the alternative, (b) a new trial on all issues of liability and damages as to the failure-to-warn claim, or (c) a remittitur of the verdict from $7.5 million to $1.0 million, or if plaintiff refuses to accept the remittitur, a new trial on the failure-to-warn claim.

                                                Respectfully submitted,

                                                */s/* Paul V. Esposito
                                                One of the Attorneys for defendants

Paul V. Esposito
Melinda S. Kollross
William W. Leathem
Clausen Miller PC
10 S. LaSalle Street
Chicago, IL 60603
pesposito@clausen.com
mkollross@clausen.com
wleathem@clausen.com


John W. Patton, Jr.
Todd M. Porter
PATTON & RYAN, LLC
330 N. Wabash Avenue, Suite 3800
Chicago, Illinois 60611
Ph: (312) 261-5160
Fax: (312) 261-5161
jpatton@pattonryan.com
tporter@pattonryan.com

        Attorneys for defendants, SAFARILAND, LLC and DEFENSE TECHNOLOGY
                              CORPORATION OF AMERICA

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 8, 2021, I electronically filed and served a copy of the foregoing with the Clerk of the Court via CM/ECF Filing Portal to the participant below:

>Edmund J. Scanlan
>Scanlan Law Group
>30 N. Michigan Ave.,
>Suite 1024
>Chicago, Illinois  60602
>ejs@scanlanlawgroup.com
>Counsel for Plaintiff David Hakim

*Thomas McCabe*